# Exhibit 1

1  MCNUTT LAW GROUP LLP
   SCOTT H. MCNUTT (CSBN 104696)
2  SHANE J. MOSES (CSBN 250533)
   219 9th Street
3  San Francisco, California 94103
   Telephone: (415) 995-8475
4  Facsimile: (415) 995-8487

5
   Attorneys for
6  Leap Tide Capital Management, LLC

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11 | In re                                  | Case No. 16-30654-HLB
12 | DIADEXUS, INC.,                        | Chapter 7
13 |         Debtor.                        | Adv No. TBD
14 |                                        | **COMPLAINT FOR:**
15 | LEAP TIDE CAPITAL MANAGEMENT LLC,      | **(1) NEGLIGENCE;**
   |                                        | **(2) GROSS NEGLIGENCE; and**
16 |         Plaintiff,                     | **(3) BREACH OF FIDUCIARY DUTY**
17 |     vs.
18 | LORI RAFIELD; LEONE PATTERSON;
   | KENNETH C. FANG; ADEOYE
19 | OLUKOTUN; ELIZABETH HUTT
   | POLLARD; JAMES R. SULAT; JOHN J.
20 | SPERZEL; and JOHN T. CURNUTTE
21 |         Defendants.

22

23

24        Leap Tide Capital Management, LLC ("Leap Tide" or the "Plaintiff") directly and as

25 successor-in-interest to the rights and claims of the bankruptcy estate of Diadexus, Inc.

26 ("Diadexus" or the "Debtor") by and through its undersigned counsel, brings this complaint (the

27 "Complaint") against the former directors and officers of the Debtor (the "Defendants"), and in

28 support of the Complaint, alleges as follows:

## I. INTRODUCTION

1. This Complaint arises from the gross mismanagement of Diadexus by its Officers and Directors, and in particular by its Chief Executive Officer, Lori Rafield ("Rafield"). Prior to filing for Chapter 7 bankruptcy, Diadexus was a healthcare diagnostics company that had been successfully marketing and selling an FDA approved test that was used to evaluate the risk of coronary heart disease and ischemic stroke. Only 18 months before filing for bankruptcy, Diadexus had received FDA approval for a second test which Diadexus believed had a much wider market.

2. During the years prior to the bankruptcy, Diadexus generated in excess of $18 million per year in revenue. It had also successfully decreased its costs, and was ramping up sales of its new product. As of March 31, 2016, less than three months before Diadexus was forced to liquidate in Chapter 7, it had more than $6 million in cash. One week before it filed for bankruptcy, Diadexus had $3.5 million in cash, and was an operating business.

3. As a direct result of Rafield and the other Defendants' gross mismanagement and breaches of fiduciary duty, Diadexus lost all of its operating capital, was forced into Chapter 7, and had its assets liquidated in a fire sale.

4. In large part, this situation ties to a letter dated April 13, 2016, from Oxford Finance LLC ("Oxford"), Diadexus's secured lender. Oxford asserted that although Diadexus was fully in compliance with its payment obligations, it was in default under non-payment terms of the loan. Critically, Oxford stated that it might exercise any default remedies available to it, and was evaluating whether to do so on a "day-to-day" basis. These potential remedies included sweeping Diadexus's bank accounts.

5. Shockingly, in the two months following Oxford's threat to take action that could shut down the company, the Defendants failed to take any action preventing Oxford from sweeping the millions of dollars of essential operating capital from its bank accounts. The Plaintiff believes that the evidence will show that this resulted largely from Rafield's refusal to accept any solution that deprived her of her equity interest and control.

6. As a direct result of the Defendants' misconduct, catastrophe struck on June 7, 2016, when Oxford swept Diadexus's bank accounts. This left the company with no operating capital. It was not even able to pay employees their final paychecks. As a result, Diadexus was forced to file for Chapter 7 bankruptcy less than a week later. This foreseeably led to a fire sale of the company's assets.

7. In sum, through their gross mismanagement and breaches of fiduciary duty, the Defendants caused a successful biotech company with a decades long track record, nearly $20 million in annual revenue, and several million dollars in operating reserves to plunge into a Chapter 7 fire sale in a matter of months.

8. Although evaluating the resulting damages to the company and its creditors will require determination at trial based on consideration of the going concern value of the business, these damages are clearly measured in the millions, and most likely tens of millions. In a demand letter to the Defendants, the Chapter 7 Trustee estimated the damages as in excess of $8.8 million, and likely as much as $20 million.

## II. JURISDICTION

9. On June 13, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). The Debtor's Chapter 7 case is denominated as Case Number 16-30654 (the "Main Case").

10. The District Court for the Northern District of California has original subject matter jurisdiction over this adversary proceeding pursuant to the provisions of 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 541. The District Court has, by general order, referred the Main Case and all adversary proceedings filed in connection with the Main Case to the Bankruptcy Court. Venue is proper here pursuant to the provisions of 28 U.S.C. § 1409.

11. This matter is either a core proceeding pursuant to Federal Rule of Bankruptcy Procedure 7008 and 28 U.S.C. § 157(b), or a proceeding related to the Main Case as defined by 28 U.S.C. § 157.

## III. **PARTIES**

12. Defendant Lori Rafield is an individual who resides in Menlo Park, California. At times relevant to this Complaint, Rafield was the Chief Executive Officer of the Debtor and a member of the Board of Directors of the Debtor (the "Board").

13. Defendant Leone Patterson ("Patterson") is an individual who resides in Alameda, California. At times relevant to this Complaint, Patterson was the Chief Financial Officer of the Debtor.

14. Defendant Kenneth C. Fang ("Fang") is an individual who resides in San Francisco, California. At times relevant to this Complaint, Fang was the Chief Medical Officer of the Debtor.

15. Defendants Adeoye Olukotun, Elizabeth Hutt Pollard, James R. Sulat, John J. Sperzel, John T. Curnutte, Karen Drexler (collectively, together with Rafield, the "Directors" and together with Rafield, Patterson, and Fang, the "Directors and Officers") are individuals who reside in the State of California, and/or did business in the State of California during the times relevant to this Complaint. At times relevant to this Complaint, the Directors were members of the Board of the Debtor, and were compensated by the Debtor for serving on the Board.

16. Plaintiff Leap Tide Capital Management, LLC is a Delaware limited liability company. Leap Tide is an equity holder in and creditor of the Debtor. By virtue of an Assignment and Sharing Agreement dated May 8, 2018, and approved by the Bankruptcy Court on June 11, 2018, Leap Tide is the successor in interest to all claims of the Diadexus bankruptcy estate against the Directors and Officers.

17. As the successor in interest to the Trustee, the Plaintiff does not have personal knowledge of the internal decision making processes of Diadexus and the Defendants, and therefore alleges all of those facts on information and belief. The Plaintiff reserves its right to amend this Complaint to allege additional claims against Defendants.

/ / /

/ / /

/ / /

## IV. STATEMENT OF FACTS

18. Prior to filing for bankruptcy, Diadexus was a successful healthcare diagnostics company. Diadexus was founded in 1995, originally under the name Genevax, Inc. The company developed and commercialized products that provide valuable information to assist in management of cardiac disease.

19. Diadexus is not a failed start-up. On the contrary, it was a publicly traded company that had been successfully marketing and selling its products for more than a decade when it abruptly filed for bankruptcy in 2016.

20. Diadexus developed two pioneering Lp-PLA$_2$ tests. Lp-PLA$_2$ is an enzyme that plays a role in blood vessel inflammation. It is used as a marker for cardiac disease, and Lp-PLA$_2$ tests can be used to evaluate the risk of coronary heart disease, heart attack, or certain kinds of stroke.

21. The first of Diadexus's Lp-PLA$_2$ tests, the "PLAC ELISA" test, had been on the market for approximately 11 years when the bankruptcy was filed. This test aids physicians in assessing risk for both coronary heart diseases and ischemic stroke in patients with atherosclerosis. In an earning call in August 2015, less than a year before bankruptcy, Rafield described this test as follows: "PLAC ELISA is an important product for Diadexus as it provides a solid foundation to top line revenue growth and important cash flow."

22. Diadexus's second Lp-PLA$_2$ test, the "PLAC Activity" test, was approved by the FDA in December 2014, and launched to market by Diadexus in 2015. The PLAC Activity test is particularly useful because it aids in predicting risk of coronary heart disease in patients with no prior cardiac events.

23. The company that acquired the Diadexus assets in a bankruptcy sale for only $4.4 million described the Diadexus tests as follows in its press release announcing the acquisition: "The PLAC Test ELISA Kit is the only blood test cleared by the FDA to aid in assessing risk for both coronary heart disease (CHD) and ischemic stroke associated with atherosclerosis. The PLAC test for Lp-PLA2 Activity is the only FDA approved test for risk prediction of CHD in patients with no prior history of cardiovascular events. The PLAC assays are recommended to be

used as an adjunct to traditional risk factor assessment to identify moderate and high-risk individuals who may actually be at an increased risk for heart attack or stroke."

**B.     Events Leading Up To Bankruptcy**

24.     On April 13, 2016, Diadexus's lender and collateral agent, Oxford, sent a letter to Diadexus asserting that Diadexus was in default under certain covenants (the "Default Letter").

25.     Oxford asserted that "Events of Default have occurred and are continuing under Sections 8.3 (Material Adverse Change), 8.5 (Insolvency), and 8.2(a) Covenant Defaults (as a result of the failure to provide timely notice of Events of Default under Section 6.9)."

26.     Oxford further asserted that "the Collateral Agent has the right to accelerate the maturity of the unpaid balance of the Obligations," and that "the Lender is entitled to exercise any and all default-related rights and remedies under the Loan Agreement and/or applicable Law."

27.     Oxford's Default Letter made it clear that Oxford could take action at any point. Among other things, Oxford stated that Oxford intended "to monitor the default situation very carefully, and will decide in their sole discretion on a 'day-to-day' basis whether or not to exercise rights and remedies." Oxford specifically stated that neither any delay in exercising default remedies nor any ongoing discussions would be a waiver and could not be relied on as to further forbearance.

28.     In the Default Letter, Oxford specifically stated that it might exercise any and all remedies under the loan agreement. Diadexus's Directors and Officers were aware that Oxford could at any time exercise remedies that would lead to an immediate shutdown of operations, destroying the going concern value of the business.

29.     Among other things, Oxford had the ability to sweep the bank accounts of Diadexus without further notice to Diadexus, which would (and ultimately did) leave the company without any ability to operate.

30.     As of receiving the Default Letter, Diadexus's Directors and Officers knew that Oxford could take action at any time, including by sweeping all of the company's cash.

31.     Although Diadexus was facing longer term liquidity issues, its ability to operate in the summer of 2016 was not threatened but for the possibility of action by Oxford. As of the end

of the first quarter of 2016, Diadexus reported cash and cash equivalents of approximately $6.3 million, in addition to accounts receivable (net of reserves) of approximately $1.8 million. This was as of March 31, 2016, less than two weeks before the Default Letter.

32. For the following two months, despite knowing that Oxford could shutdown Diadexus at any moment, despite having at various times between $3.5 and $6 million in operating capital in the bank, despite believing that Oxford had no legal basis to declare a default, and despite the fact that the company continued to do business and generate substantial revenues, the Directors and Officers failed to take any action that would prevent Oxford from destroying the value of the company.

33. Then, on June 6, 2016, Diadexus's bank accounts were swept of all cash. This resulted in the transfer of $3.5 million to Oxford. More critically, it left Diadexus completely unable to operate. Without operating capital, the Board apparently determined that a Chapter 11 was impossible.

34. On June 10, 2016, Diadexus announced that it would be filing for bankruptcy under Chapter 7 of the bankruptcy code.

35. On June 13, 2016, Diadexus in filed its Chapter 7 petition.

C. **The Directors and Officers' Misconduct Leading to Bankruptcy**

36. Prior to Oxford sweeping the bank accounts on June 7, 2016, the Directors and Officers failed to take the necessary actions to prevent the bank sweep and shutdown of the company. The Plaintiff is informed and believes that this was the direct result of Rafield and other Directors and Officers acting to protect their equity interests at the expense of creditors.

37. Despite knowing that the company needed to restructure, Diadexus failed to hire a financial restructuring advisor until forced to do so by Oxford. Diadexus eventually hired Alvarez & Marsal ("A&M") on April 14, 2016, only doing so at the insistence of Oxford.

38. After hiring A&M, the Directors and Officers failed to follow the advice of their professional advisors.

39. In particular, A&M specifically advised Diadexus management that it was imperative that Diadexus sign a forbearance agreement with Oxford. Among other things, A&M

informed Diadexus management, including Rafield and Patterson, that the forbearance agreement was standard as a precursor to negotiations with the lender. This advice was given, among other times, in a presentation on April 25, 2016, six weeks before the accounts were swept.

40. The failure to sign a forbearance agreement was not because Oxford was unwilling to agree to forbearance. Oxford presented a forbearance agreement, and Diadexus and Oxford exchanged multiple drafts in April and May 2016. Diadexus simply never signed an agreement, leading to catastrophe. The Plaintiff is informed and believes that Rafield and the other Directors and Officers refused to accept Oxford's terms in order to maintain their own control of the situation and protect their equity interests.

41. The Plaintiff is informed and believes that Rafield blocked possible of sales that would have provided a meaningful return to creditors but resulted in the loss of her equity interest. During the months prior to the bankruptcy, Diadexus did receive inquiries and offers from a number of potential buyers. At least six entered into non-disclosure agreements to review due diligence materials. Shortly thereafter, however, Rafield caused Diadexus to shut down the data room and bar potential buyers from accessing the due diligence materials.

42. The Plaintiff is also informed and believes that Diadexus unduly limited the role of A&M, and hindered A&M's ability to provide meaningful help within the broad scope of A&M's engagement agreement. The Board appears to have been willing to work with A&M only because the Board thought that doing so would get Oxford to agree to a refinancing deal. At the same time, the Directors and Officers deliberately limited A&M's involvement, in order to preserve management's role.

43. The Plaintiff is informed and believes that Rafield, and possibly other Directors and Officers, did not act in the best interests of the company and its creditors, because they feared a sale of the business would have wiped out their equity interest. Rafield was only willing to pursue a refinance or sale that would preserve or provide a return on her equity interest, and/or leave her in control of the business. In doing so, Rafield allowed her self-interest to prevail over her fiduciary duty.

44. As the Chief Executive Officer and Chief Financial Officer, respectively, Rafield and Patterson were personally responsible for managing the sale and refinance process, negotiating with Oxford, deciding to not sign the forbearance agreement, and closing the data room to potential buyers.

45. The Directors failed to act in good faith and instead intentionally acted contrary to the best interest of the business in allowing management to pursue a self-interested course of action at the expense of Diadexus's creditors. These acts demonstrate a lake of devotion to the interests of the corporation and its shareholders and creditors.

46. The Directors failed to exercise reasonable care by allowing management to proceed for two months under the imminent threat of a sweep of the corporate bank accounts without signing a forbearance agreement or taking any other action. The Directors allowed Rafield to gamble with the company in order to preserve her position at the expense of creditors.

47. Following the bankruptcy fire sale of the assets, the Trustee sent a demand letter, dated October 25, 2016, to the Directors and Officers, alleging that the Directors and Officers breached their fiduciary duties to Diadexus, for reasons largely the same as those set forth in this Complaint (the "Trustee's Demand"). The Trustee's Demand stated that damages resulting from the Directors and Officers' misconduct were "no less than $8.8 million, and more likely more than $20 million." The Trustee further asserted that "[t]hese damages were the direct result of the breaches of fiduciary duty by the directors and officers of Diadexus."

48. A true and accurate copy of the Trustee's demand is attached hereto as **Exhibit A**.

D. <u>The Bankruptcy Case</u>

49. Because the case was filed with no cash, the Chapter 7 Trustee was left with minimal options. In particular, it was no longer possible to engage in any meaningful efforts to market the Intellectual Property (which as recently as 2015 was generating $18 million in annual sales revenues, despite the fact that the new PLAC Activity test was only ramping up).

50. The Trustee was forced to immediately liquidate the Debtor's assets in a fire sale. The Debtor's critical assets included cell lines that would die if not kept in a temperature cooled environment at a cost of $8,600 per *day*. The Trustee described these cell lines as the "principal

"value" of the company.  Because the Directors and Officers' misconduct had left the estate with no capital, the Trustee had to immediately sell, relying on a buyer to pay the costs of preserving the cell lines until a sale could close.

51. The urgency was compounded by the fact that the Trustee determined, as stated in his motion to sell, that former employees were unwilling to cooperate with the sale process because they were not paid their final wages before the bankruptcy was filed.

52. Because of the extreme urgency, the Trustee almost immediately entered into an agreement with an Cleveland Heartlab, an interested buyer that had purchased the Oxford claim post-petition for an undisclosed sum.  The Trustee filed a motion to approve the sale on July 7, 2016.

53. Because of the difficult situation the Trustee was placed in, there was no opportunity for marketing of the Trustee's sale.  Further, the deadline to submit competing bids was July 13, 2016, only six days after the sale motion was filed.  As a result, only one competing bid was offered.

54. The Plaintiff is informed and believes that the sale price was further substantially depressed because the original bidder was not permitted to credit bid.  That meant that they were forced to raise cash in the amount of any bid, in addition to the cash they had just paid for the claim.  As a result, the original bidder, Cleveland Heartlab, pulled out of the bidding at just over $4.5 million, and the only other bidder obtained the entire assets of the company, including the physical assets and the intellectual property, for only approximately $4.75 million.

55. In a systematically marketed sale of the assets on an operating basis, with a reasonable time to submit bids, a much higher sale price would have been expected. Unfortunately, the conduct of the Directors and Officers allowed Oxford to sweep the operating capital and forced a fire sale instead, bringing in only $4.75 million for assets that supported more than $18 million in annual revenue, and included a promising new test that had recently received FDA approval.

V.  **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Negligence**

**(Against all Defendants)**

56. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 55, above, as if fully set forth herein.

57. As officers and directors of the Debtor, the Directors and Officers owed the Debtor a duty of care to exercise the diligence, care, and skill that ordinary prudent persons would exercise under similar circumstances in the management, supervision, and conduct of the Debtor's business and financial affairs, including its fundraising, financing, and relationship with its lenders.

58. The Directors and Officers agreed and were obligated by statute, contract, and/or common law to diligently and honestly administer the affairs of the Debtor. The Directors and Officers owed the Debtor the highest duty of care and diligence in the management and administration of the affairs of the Debtor, in the use and preservation of its assets, and in the adoption and execution of business practices that were sound and prudent.

59. The Directors and Officers are not entitled to application of the business judgment rule, because none of the Directors and Officers' actions that are the basis of this claim were taken in good faith. Nor were the Directors and Officers reasonably well informed in taking such actions or inactions, because the Directors and Officers directly and repeatedly ignored the advice of their professional financial advisors, including the advice to sign the forbearance agreement, and knowingly ignored a clear and immediate catastrophic risk.

60. Each of the Directors and Officers, during the time he or she was a Director or Officer, was negligent in abdicating her/his responsibilities to the Debtor. Each of the Directors and Officers was unreasonable and failed to act in good faith in knowingly allowing Oxford to eviscerate the business, failing to act to prevent the shutdown, not engaging in a good-faith sale process, shutting down or allowing the shutdown of the due diligence room, not following the

advice of A&M, not executing a forbearance agreement, and not filing for Chapter 11 prior to Oxford sweeping the accounts.

61.     As a direct and proximate result of the negligence of the Directors, the bankruptcy estate and its creditors suffered damages in an amount to be determined at trial, but not less than $8,800,000.

## SECOND CLAIM FOR RELIEF

### Gross Negligence

### (Against all Defendants)

62.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 61, above, as if fully set forth herein.

63.     As officers and directors of the Debtor, the Directors and Officers owed the Debtor a duty of care to exercise the diligence, care, and skill that ordinary prudent persons would exercise under similar circumstances in the management, supervision, and conduct of the Debtor's business and financial affairs, including its fundraising, financing, and relationship with its lenders.

64.     The Directors and Officers agreed and were obligated by statute, contract, and/or common law to diligently and honestly administer the affairs of the Debtor.  The Directors and Officers owed the Debtor the highest duty of care and diligence in the management and administration of the affairs of the Debtor, in the use and preservation of its assets, and in the adoption and execution of business practices that were sound and prudent.

65.     The Directors and Officers are not entitled to application of the business judgment rule, because none of the Directors and Officers' actions that are the basis of this claim were taken in good faith.  Nor were the Directors and Officers reasonably well informed in taking such actions or inactions, because the Directors and Officers directly and repeatedly ignored the advice of their professional financial advisors, including the advice to sign the forbearance agreement, and knowingly ignored a clear and immediate catastrophic risk.

66. Each of the Directors and Officers, during the time he or she was a Director or Officer, was grossly negligent in abdicating her/his responsibilities to the Debtor. Each of the Directors and Officers was unreasonable and failed to act in good faith in knowingly allowing Oxford to eviscerate the business, failing to act to prevent the shutdown, not engaging in a good-faith sale process, shutting down or allowing the shutdown of the due diligence room, not following the advice of A&M, not executing a forbearance agreement, and not filing for Chapter 11 prior to Oxford sweeping the accounts.

67. Each of the Directors and Officers was grossly negligent in that his/her manner of carrying out his/her duties and responsibilities to the Debtor constituted a lack of even scant care and represented an extreme departure from the ordinary standard of care. The Directors and Officers acted with such a degree of carelessness and inattention to the performance of their duties as to constitute gross negligence. In so doing, they allowed an operating business with several million dollars in cash and revenues in excess of $18 million per year to lose all of its operating capital and be sacrificed in a disastrous fire sale.

68. As a direct and proximate result of the gross negligence of the Directors, the bankruptcy estate and its creditors suffered damages in an amount to be determined at trial, but not less than $8,800,000.

**THIRD CLAIM FOR RELIEF**

**Breach of Fiduciary Duty**

**(Against Rafield)**

69. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 68, above, as if fully set forth herein.

70. As the Chief Executive Officer of the Debtor, Rafield owed it duties of care and loyalty.

71. As a fiduciary, Rafield was obligated by her duty of care to act at all times on an informed basis, using the amount of care that a reasonable person in her position would use under similar circumstances.

72. Rafield was also obligated by her duty of loyalty to act rationally and with the highest degree of good faith, and with true faithfulness and devotion to the interests of the corporation and its creditors.

73. As the Chief Executive Officer of the business, Rafield was directly responsible for overseeing management of all aspects of the business, including but not limited to negotiations with Oxford, the forbearance agreement, the involvement of A&M, and any marketing and sale of the business.

74. Rafield breached her fiduciary duties of care and loyalty when she, *inter alia,* failed to engage in a good faith effort to sell the business, shut potential buyers out of the due diligence room, limited A&M's involvement, disregarded A&M's advice, did not enter into a forbearance agreement with Oxford, and knowingly failed to take any action that would prevent Oxford from sweeping the bank accounts.

75. Rafield's acts and omissions were not a rational and/or good faith exercise of prudent business judgment to protect and promote Diadexus's interests.

76. Plaintiff is informed and believes, and on that basis alleges, that Rafield acted with a purpose other than the best interest of Diadexus, in that she was unwilling to consider any options that deprived her of control or would have the effect of depriving her of her ownership of the company and/or not provide any return to equity holders.

77. As a result of Rafield's self-interest and failure to act in the best interests of Diadexus, she allowed an operating business with several million dollars in cash and revenues in excess of $18 million per year to lose all of its operating cash and be sacrificed in a disastrous fire sale.

78. As a direct and proximate result of the Rafield's failure to exercise her duties of loyalty and care, the bankruptcy estate and its creditors suffered damages in an amount to be determined at trial, but not less than $8,800,000.

/ / /

/ / /

/ / /

## FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against Director Defendants)

79. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 78, above, as if fully set forth herein.

80. As members of the Board or officers of Diadexus, the Directors owed it duties of care and loyalty.

81. As fiduciaries, each of the Directors was obligated by their duty of care to act at all times on an informed basis, using the amount of care that a reasonable person in their position would use under similar circumstances.

82. The Directors were also obligated by their duty of loyalty to act rationally and with the highest degree of good faith, and with true faithfulness and devotion to the interests of the corporation.

83. As members of the board of directors of Diadexus, the Directors were directly responsible for overseeing management's actions with regard to all aspects of the business, including but not limited to negotiations with Oxford, the forbearance agreement, the involvement of A&M, and any marketing and sale of the business.

84. The Directors breached their fiduciary duties of care and loyalty when they, among other things directly or through oversight of management, failed to engage in a good-faith effort to sell the business, shut potential buyers out of the due diligence room, limited A&M's involvement, disregarded A&M's advice, did not enter into a forbearance agreement with Oxford, and knowingly failed to take any action that would prevent Oxford from sweeping the bank accounts.

85. The Directors' acts and omissions were not a rational and/or good faith exercise of prudent business judgment to protect and promote Diadexus's interests.

86. Plaintiff is informed and believes, and on that basis alleges, that Rafield acted with a purpose other than the best interest of Diadexus, in that she was unwilling to consider any options that deprived her of control or would have the effect of depriving her of her ownership of the company and/or not provide any return to equity holders. In allowing Rafield to pursue a

course of action that was inconsistent with the best interests of the corporation, the Directors engaged in misconduct that exhibits a lack of good faith.

87. As a result of the Directors' failure to act in the best interests of Diadexus, they allowed an operating business with several million dollars in cash and revenues in excess of $18 million per year to lose all of its operating cash and be sacrificed in a disastrous fire sale. As a direct and proximate result of the Directors' failure to exercise their duties of loyalty and care, the bankruptcy estate and its creditors suffered damages in an amount to be determined at trial, but not less than $8,800,000.

## VI. PRAYER

WHEREFORE, the Plaintiff prays for relief against the Defendant, as to all causes of action set forth herein as follows:

1. For judgment against the Defendants on all Claims for Relief;

2. For an award of damages suffered by the bankruptcy estate and its creditors as a result of Defendants' actions, conduct, breaches, omissions, and failures set forth above, on all Claims for Relief, in an amount to be proven at trial but not less than $8,800,000.

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court may deem just and proper.

DATED: June 13, 2018                    McNUTT LAW GROUP LLP


                                        By:     /s/ *Shane J. Moses*
                                            Shane J. Moses
                                            Attorneys for Leap Tide Capital
                                            Management, LLC